Case number 14-7082. Rosalie Simon et al. Appellants v. Republic of Hungary et al. Mr. Gasson for the appellants, Mrs. Kilter for the appellees. Good morning. May it please the court, I am Paul Gasson and with me today at council table are Liesl Schofler, Charles Fax, David Weinstein, and Mark Zell of Jerusalem. This case concerns claims against the one state which participated in the Holocaust, but which has to date never accepted responsibility for its role. Indeed, its new constitution expressly denies responsibility. The issues on appeal are questions related to interpretation and application of the Foreign Sovereign Immunities Act, but what is at stake is the hope for justice and accountability of the ever dwindling number of Hungarian Holocaust survivors. They were deeply wronged by the Acts of Hungary and its state railway, MAV, which deported over one half million Jews to their deaths and bore to unimaginable suffering. The central issue on appeal is the interpretation and application of the so-called treaty exception to the FSIA, 28 U.S.C. 1604. That provision states that all the other immunity and exception to immunity provisions of the FSIA are, quote, subject to existing international agreements to which the United States is a party at the time of the enactment of this Act, which was treaty exception was interpreted extremely narrowly by both the Supreme Court and this Court as requiring an express conflict between the relevant treaty provisions and the FSIA's provisions with respect to the foreign sovereign's immunity or its amenability to suit. The Supreme Court expressly so held in Amarada Hess, and this Court followed suit in the Prince case. There is no such conflict here. Nothing in the 1947 Treaty of Peace addresses Hungary's amenability to suit or its immunity to claims such as those presented here. And the 1973 Executive Agreement simply does not apply to plaintiffs here who were not U.S. nationals at the time of the takings. Mr. Gaston, can I ask you this question about the 1947 Treaty? Yes. If in Article 27, oh, first let me just ask this. Article 27, I take it, does deal with something that overlaps with the claims that you're bringing in this case? Yes, Article 27 deals with discriminatory takings from those who were subject to Hungarian jurisdiction, and our plaintiffs were subject to Hungarian jurisdiction. So if Article 27 overlaps, and let's suppose that Article 27 had said the claims will be handled exclusively in the manner set forth herein. So it's an exclusivity provision, and it says that, yes, Hungarian nationals, of course, have an entitlement to compensation and to get a return of their property if it still exists or compensation for the value of the property. And the way that's going to be administered is under the auspices of this treaty, and that's the exclusive way in which it's going to happen. Would you then take the position that this treaty exception still isn't implicated because there's not an express conflict in the sense that that doesn't specifically speak to immunity? Or would you say that because that sets forth an exclusive claims resolution mechanism, this is the way these claims are going to be administered, that it's incompatible with the FSIA exception, and therefore the treaty would control? Well, if Article 27 said what you said, but also in addition said, and we are setting up a forum or a tribunal to hear these claims of people who have such claims, then I would agree there is an express conflict. Article 27 did nothing of the sort. Article 27 simply states that Hungary undertakes to compensate those subject to Hungarian jurisdiction at the time who had discriminatory takings and other measures of sequestration and so on. It did not set up a tribunal. It did not set up any claims mechanism. Nobody knew about it, and certainly it wasn't even publicized at the time. They didn't even set up an Article 27 was essentially aspirational or exhortatory, but it did not do any of those things, and it certainly did not deal with how such claims would be administered, heard, determined, or paid. What was the purpose of Article 27 then? I mean, what was the party's intent in negotiating it and putting it into treatment? I think it was basically just to let Hungary know that the parties who won the war thought that what Hungary did was shameful and wrong, and Hungary should take some steps to compensate those it had injured. And I think it was essentially kind of like a U.N. charter or something like that, which sets out principles that they believe should govern the behavior of one  party. Article 40 does have specific measures to take if there is a dispute as to the interpretation and application of the treaty, but it's absolutely clear that those are measures that only the signatories to the treaty, only the sovereign entities that entered into the treaty can take. It says if a dispute as to interpretation and application cannot be resolved through diplomatic channels or diplomatic means, then it must be referred to the three heads of mission in Budapest. And if that doesn't work, then each party can appoint a representative who can then appoint a third party who can decide any possible ties. None of our claimants could do any of those things. Only Hungary could. Only the United States could. Only Great Britain could. Only the actual sovereign entities that were parties to the treaty could do anything to resolve a dispute as to interpretation of the treaty. But if you put Article 40 to one side just for the moment, and we only look at Article 27, then, in your view, if Article 27 had done all the things that we talked about, it set up a claims resolution mechanism that's going to be administered by the Hungarian government, then that would be incompatible with the FSI exception, regardless of Article 40. And if it also said that it was exclusive. I think Your Honor posited that. Yes. If it did all those things, then probably we would not object. We could not make the argument that we're making today. And on Article 27, so Article 27 sub 2 does something with the property. Does it? So it gives the property to the organizations. It purports to do it. Once again, we consider this exhortatory or something that would be great to do and Hungary undertakes to do it. We don't think Hungary ever did that. It never actually collected or inventoried, as far as we know, the specific property at issue. It never opened up any offices or claims forum for people to go and try to get any of their property. And we doubt that Hungary, we strongly doubt, historically, there is no evidence that Hungary after the six-month period, which also is ridiculous in terms of post-war Hungary, but that after the six-month period, it took all this property and then put it into some separate fund or relief kind of organization. So I'm not going to deny that everything you said is true. Let's suppose that is. But then Article 40 exists for a state to raise those kinds of objections, as you said. But in terms of what Article 27 itself contemplates, does it necessarily contemplate that there's going to be a resolution mechanism under the auspices of the Hungarian government? It doesn't. The fact that it envisions that the corpus, that the property that's at issue is going to be given to organizations within Hungary, what is the upshot of that? Because it seems to contemplate that then the place one would go to try to retrieve the property would be something under the auspices of those organizations as administered by the Hungarian government? Or why else would you provide for the property to go to the organization? I think the thought was so many people had died, we're talking about 500,000 people who never returned or close to that number, that they realized that there would be quite a bit of unclaimed property, and they wanted to do something with that and suggested that this might be a possible resolution of that issue. So the presupposition is that a lot of the property is going to be unclaimed for very understandable reasons. I believe historically that's true, yeah. I don't think it changes our analysis, though, Your Honor, because ultimately we are looking for an express conflict as to immunity to You could argue that that provision potentially, had it been honored, would have created some sort of implied conflict. It certainly never created any kind of express conflict. This treaty is still in effect, is it? Yes, it is. Has it ever, since the early 90s and the end of the Soviet domination, has Hungary made any attempt under this treaty? No, Your Honor. In fact, after the Soviet domination ended in 1991 and 1992, Hungary went through the motions of passing, enacting some legislation that it thought would basically absolve itself of any further responsibility. Hungary's own expert said that that was partial The Hungarian constitutional court itself said that Hungary had not yet fully complied with the terms of the 1947 treaty. Later on, I forget if it was much more recently in the 2000s, oh, I think it was 1997, Hungary did open another so-called Jewish restoration fund and funded it with some millions of dollars. Did it do it pursuant to this treaty? I think they did it with the idea that they were redressing the Hungarian constitutional court's finding that they had not complied with the treaty. So I think they made an attempt to do so. But as we say, the compensation was paltry, it was partial under Hungary's own expert witnesses' analysis, and it really did nothing for the particular claimants here. I mean, as laudable as it may be to fund a Jewish restoration fund, it has nothing to do with restoring the property to its rightful owners or to compensate them. In fact, our information is, and we've alleged this in the complaint, that the Jewish restoration funds were not used to actually help Jews or Jewish organizations, except very rarely. Can I ask one other question about the treaty exception and the implication of Article 27, which is, this isn't your case and these are not your clients, but suppose there were U.S. nationals or countries other than Hungary, the nationals of countries other than Hungary who came forward with claims in U.S. court, then Article 26 comes directly into issue. And do you read Article 26 to preclude the bringing of claims by non-Hungarian nationals because Article 26 presupposes a dispute resolution mechanism and sets forth that two-thirds compensation will be paid and things of that nature? So do you think there's a difference between a Hungarian national and a non-Hungarian national with respect to the treaty exception, or do you think that they stand or fall together? I don't recall. Perhaps my memory is faulty, but I don't recall Article 26 setting forth a dispute resolution mechanism. I don't know that it does by terms, but it seems, I guess the question would be, how much does it obviously contemplate one? Well, I'm not an expert in Article 26, but my general impression is that, standing on its own, it did nothing more than Article 27, and that, in fact, the executive agreement in 1973 did do something toward implementing Article 26 because it did deal with the nationals of the United States. Yes. A quick note in our reply brief. We, at page 3, we did make an error, and I'd like to bring that to the Court's attention. We incorrectly stated that the executive agreement made no reference to the 1947 treaty. In fact, it does, and we regret that misstatement. I did try to reserve two minutes, so if the Court has further questions, I'd be happy to address them. If not, I'll reserve. I'd like to ask you about the expropriation exception and your allegations of the nexus between expropriated property and property here in the U.S. And I understand the railway has something to do with, I think, tourism business. Yes. How about the sovereign itself? Okay. Well, we can meet the requirements of the expropriation exception if we show either of two nexuses. Either we have to show that the sovereign, the state of Hungary, does business in the United States and uses the expropriated property or property exchange for that property in connection with that business, or we can show that the instrumentality does business in the United States and it has property or property exchange for that property anywhere in the world. And we have made specific allegations with respect to the instrumentality because we have alleged they take tickets and they take reservations and they have an office for that in the United States. We don't have quite as specific an allegation with respect to the sovereign, and we would need to flesh out our allegation with respect to the sovereign with some discovery. But our basic position is it really doesn't matter. We get jurisdiction over both the sovereign and the instrumentality if we show either of those two disjunctive nexi are true. I have another question about the expropriation exception. Sure. Which is this, that the relationship between A5 and A3, the noncommercial tourist exception, so under the noncommercial tort exception, although the acts that are set forth in the complaint obviously constitute torts, to say the least, there could be no recovery under that exception because of the limitation that the conduct had to occur on U.S. soil. That's right. And so it seems like there's a disconnect between Congress having thought about the damages for recovery under A5 and precluding recovery in the circumstances of this case, including for property loss, because I think A5 specifically refers to damages for loss of property. But then reading the statute to say, but nonetheless, claims like this can come within A3 that are property-based, it seems like there's a little bit of a disconnect because Congress thought about the extent to which torts that give rise to loss in property could be actionable under A5 and said, only thus far, whereas under your theory, those claims would nonetheless, property-based claims would nonetheless come in under A3? Yes, Your Honor, and there are two answers to that. One, under the Supreme Court's recent decision in NML Capital, it made it crystal clear that the Court should apply the FSIA as written. There is no shading one way or shading another way. If the provision of the FSIA supports an absence of immunity or a piercing of immunity, it should be applied that way. Second, there is not necessarily a disconnect. It could be that Congress thought that in the commercial activity exception, there has to be some sort of impact on the United States because we're talking about one kind of exception that dates from the Tate letter and has a whole history behind it, whereas in the expropriation exception, what we're talking about is something that almost always happens abroad and is derived from concerns related to American investment abroad. And if, for example, a foreign country, such as in the McKesson case, expropriates your interest in a dairy in Iran, well, does that interest have to come into the United States for you to be able to state a claim under 1605A3? Not necessarily, because your interests are impacted regardless of where the expropriated property is. And one follow-up with regard to the domestic takings issue. So is your argument on domestic takings the one that the Seventh Circuit adopted, which is that the general understanding that domestic takings don't raise an issue of international law, it doesn't apply in a situation in which the domestic takings were in facilitation of genocide? Yes, absolutely. But also I'd like to mention the De Chapelle case, Judge Hubell's opinion in the court below, which held to the same effect but added the additional rationale that these Hungarian Jews were completely stripped of all appurtenances of citizenship, all rights of citizenship, and not treated as citizens. So why should the domestic taking exception deprive them in this situation? Right, which the Seventh Circuit didn't agree with, but they had another basis for it. So on that issue, on the Seventh Circuit's rationale, so the statute says in any case in which rights and property taken in violation of international law are an issue. And it seems like what the Second Circuit was saying was not that the rights and property are taken in violation of international law, but that rights and property were taken in facilitation of a violation of international law. And so there is, it does seem to stop one step short of what the statute itself contemplates, which is that the rights and property are themselves taken in violation of international law. Or would you disagree with that? I think there are a couple of answers to that. One, there is no question that every court that has looked at this issue, including Judge Hubell below, has held that when it's part of a program of extermination and so on, then yes, there's no question there's a violation of international law. Second, we have made an argument that was not made in the Seventh Circuit, and I think it's important to consider the argument that the Treaty of Trianon, which was signed in 1920 and which applied all this time, was also violated as soon as any of these rights and property were taken on a discriminatory racial or religious basis. And under that treaty, you know, once that violation of international law happens, it doesn't really matter who the taking was from, whether it was your own citizen or not, because the treaty clearly applied to Hungary's treatment of its own citizens. Was that argument made below? Yes, yes, absolutely. We cited in our reply brief exactly the joint appendix where it was made, exactly the record where it was made. All right. We'll give you some time to reply. Thank you. Thank you, Your Honor. May it please the Court, Conrad Kelster on behalf of Hungary and the Hungarian National Railways. Your Honors, the 1947 treaty does present an express conflict with the immunity provisions of the FSIA. Why should we not, after 68 years, say Hungary, you've treated this treaty as a dead letter? Well, they haven't treated this treaty as a dead letter. I think that if you look at the Constitutional Court decision in 1993, what the Hungarian Constitutional Court looked at was the treaty and whether or not there had been compliance with 27.1 and 27.2. As to 27.1, the Hungarian Constitutional Court found that there was compliance and that there was compensation that had been offered in a number of reparations programs that had been enacted. I think there were two of them applying to takings and injuries that occurred during World War II. And there had been compliance in the provision of fair compensation, and there the Constitutional Court interpreted fair compensation to include not 100 cents on the dollar, but what is it that Hungary can provide given the current economy and state of affairs in Hungary, having just come out of the communist era and trying to rebuild itself. Then, looking at 27.2, what the Constitutional Court said, there had not been strict compliance with 27.2. And I think what's important about the treaty is 27.2 said not that it's a lot of Tory that Hungary should give unclaimed property to relief organizations to provide aid, but the treaty said they shall provide the unclaimed property to relief organizations. And looking at that, the Constitutional Court of Hungary said there had not been strict compliance. So what happened after that was the Hungarian government then had already committed millions of dollars to a relief organization to provide relief to Hungarian survivors of the Holocaust, first for those living in Hungary and then for those living abroad. But they took and they donated additional millions of dollars to fund this relief organization. So there still is a relief organization that was formed pursuant to the treaty to comply with the treaty obligations in terms of providing relief to survivors. So how does that create an express conflict? Because I think the argument that's being made on the other side by Mr. Gasson is that although Article 27 does overlap, it speaks to the question of the disposition of this property and it gives rise to a right to recover. It doesn't have a dispute resolution mechanism embedded within it. It doesn't prescribe how that's supposed to happen. And it doesn't say that anything that it even contemplates is going to be exclusive. So if all that's true, then what's the conflict with? Your Honor, I think you have to read Article 27 in its entirety together with Article 40 of the treaty. What Article 27 contemplates is first in 27.1 that any unclaimed property that was taken for religious reasons needs to be returned. And to the extent that it cannot be returned, then fair compensation must be paid. But then you go to 27.2. And what 27.2 says is that if the property remains unclaimed after six months, then that property must, I'm sorry, shall be given to a relief organization who were then contemplated would provide the support to the Hungarian survivors of the Holocaust to make provisions for them. Importantly, what 27.2 says, and it's in the last sentence, it says any unclaimed property after six months from 27.1, the first provision, shall also be included in this and must be given to the relief organizations. So what Article 27 does is it essentially takes the claims of the Hungarian nationals and requires Hungary to give them to these relief organizations. And so whatever rights there were to the property have now been given to the relief organization. So where Article 40 comes in is if there's a dispute about how that was done or if there's a dispute about what should have been turned over, you have to refer to the dispute provisions in Article 40 of the treaty. That's what creates the express conflict. It sets up an express forum that you have to deal with claims arising out of the execution of the treaty. And that express forum is not a court in the United States. So you're saying that any Hungarian citizen could invoke Article 40? No, what I'm saying, Your Honor, is the proper way to proceed under Article 40 is that the Hungarian citizens, if they're a Hungarian citizen, can go to their own government and seek relief. If the plaintiffs that are now United States citizens, they can go to the State Department and then ask the State Department to step in for them. If they're from Israel or Canada, they could go to their respective foreign ministries and ask those foreign ministries to get involved. And, in fact, that's exactly what happened. It led to the 1973 agreement that led to a resolution of claims. But it seems like Article 40 only matters if you assume that Article 27 envelops all the claims. Because what Article 40 tells you, even under the most charitable reading for you, is that the exclusive method by which you could complain about something that happens under Article 27 and anything else in the treaty is by this special procedure that we set up at the state-to-state procedure. But if the claims are never subsumed by Article 27 to begin with, then it doesn't matter that the way you complain about Article 27 is through Article 40 because these claims just weren't disposed of under Article 27. They persist. Well, but Article 27 does dispose of these claims. So I think you have to establish that proposition in order for Article 40 to do work. And on that antecedent proposition, which is the notion that Article 27 actually disposed of the claims, it doesn't say anything about there's other treaties, World War II-era treaties, where it's absolutely clear from the face of the treaty that claims are being espoused and disposed of. I'm not sure that the language of Article 27 says that. Well, respectfully, Your Honor, I think that if you look at the way the whole treaty is set up and all the various things that Hungary was responsible for and had to do and claims that Hungary waived, focusing in on 27, what it says and what it contemplated was Hungary is going to be responsible for either returning property or providing fair compensation. But they envisioned, rightly or wrongly, a six-month period by which the survivors would have to make claims for their property. After that six-month period of time, what the treaty says is that if it's unclaimed, Hungary shall, not would be a good thing for them to do, would be a laudable thing for them to do. It says they shall give that unclaimed property to relief organizations, and then the relief organizations will provide whatever aid or assistance that they set up and can do. So suppose, let me just ask you a very basic question. Suppose that you're a claimant, your property's gone, and then the property isn't part of the corpus that's transferred because the property just doesn't exist anymore. So your claim is not for property, it's for compensation because your property's been taken away and you never got any funds for that. The property doesn't exist anymore. So then 27 under 27.2, nothing's transferred that's relevant to your claim because there is no property by hypothesis. What you want is compensation. How does 27 preclude a claim for compensation for property that's been gone if the property doesn't exist anyways? All 27.2 does is transfer the property. Well, no, I think that if you look at 27.1, what 27.1 says is that Hungary had to either return property or provide fair compensation. Then you go to the last sentence of 27.2, and it specifically says any property contemplated, and it's really more than properties. If you look at Article 27, it talks about rights and property. And so you had to transfer any of those rights, properties, whatever interest they had, including the fair compensation, that had to be given to the relief organizations. So in effect, even though the property itself may not exist, the right to that compensation, to provide for it because it doesn't exist anymore, has to go to the relief organizations. It has to be funded by money. And that's essentially what Hungary has done in providing the millions of dollars they've provided to support the relief organization that is providing assistance to survivors. And so that's why there is, and I would submit there's an express conflict, because essentially what it says, here's what the treaty required Hungary to do. It required them to take the rights, interests, and the property, including payment to property that no longer exists, and give it to relief organizations. So there is no claim anymore. And so to the extent that there are disputes about how Hungary carried out those responsibilities or whether they provided enough compensation for the properties that they couldn't return, that's a dispute about the execution of the treaty. That's something that has to be decided under Article 40's dispute resolution provision. As I said before, looking at the 1973 agreement between the United States and Hungary, and some of the other dispute resolution, or some of the other resolution provisions that I talked about for Canada, Great Britain, and some of the other countries in our brief, that's what was done. That's what the countries did. They had direct government-to-government negotiations, which led to resolution agreements. That's how the countries envisioned that this treaty would work. In fact, looking at how wars have been settled throughout history, throughout the United States' history, this is how it's been done. The governments get together. The governments negotiate a treaty set forth in a number of provisions, and they settle claims both for the countries and for the nationals of the countries. But almost without exception, that I think is an accurate recounting of the way treaties usually work, but almost without exception, it's that a country settles the claims of its national against the other country. This one deals with the claims of Hungarian nationals. That seems to me to be different because, yes, countries often espouse the claims of their own nationals and tell the other country with which they're at war, we're going to settle the claims of our nationals. This one is an imposition of an obligation by other countries in the world that says to Hungary, we object to the way that you've treated your own citizens. We're creating an enforceable obligation not on behalf of our own nationals or a settlement of claims on behalf of our nationals. We're putting an imposition on you vis-à-vis your own citizens. That seems different than the history that you're recounting. Well, Your Honor, respectfully, I don't know that it's any different because if you look to the preamble of the 1947 treaty, what it says is the countries that are parties to the treaty are resolving any unresolved issues that arose out of the war from 1939 all the way to 1945. One of the issues that the parties discussed was how do we deal with the taking of property in Hungary by the Hungarians for religious reasons or other reasons, and what the parties agreed is this is how we're going to resolve it. You have Article 26, which deals with resolution of the allies and their nationals, and then you have 27, and how is 27 going to deal with Hungarians? That's how the treaty was set up. That's what the parties agreed to. That's what they bargained for, and that's why to the extent that this Court were to try to rule differently, then that creates, I believe, a political question, and that's why. But it didn't stop the Seventh Circuit. Well, Your Honor, I think where the Seventh Circuit went wrong is in looking at the treaty. What they didn't look at was the full all of 27-1. They only really focused on the first part of 27, which is 27-1, and what the rights or the agreement by Hungary to return property or to the extent they couldn't return it to provide fair compensation. They did not focus on the second part of 27-2, which required Hungary to take that property to the extent that it was unclaimed after six months and give it to relief organizations in effect distinguishing the claims. Did the 1973 treaty explicitly incorporate Article 26? Yes, it explicitly incorporated both Article 26 and 27. I believe it's in the record at Joint Appendix 107. It's Article 2, Paragraph 3. And I see that my time is out. Can we talk just a moment about the expropriation exception? Yes, Your Honor. So the expropriation exception says a case in which rights and property taken in violation of international law are an issue. And the Seventh Circuit, as we were discussing with counsel on the other side, said that the domestic takings exception doesn't apply because the rights and property were taken to enable the perpetration of genocide. And I guess I'm wondering if there's even a stronger argument than that, which is that it's not just that rights and property were taken in order to facilitate the commission of genocide. It's that the taking of rights and property was the commission of genocide. And because if you look at the way that genocide is defined under the Genocide Convention and under U.S. law, one part, integral part of the commission of genocide is the taking of everything that's a material resource to the victims because that's part and parcel of the process of extinguishment. So that argument would say it fits directly within the text of A3 because it's a case in which rights and property were taken in violation of international law in the sense that the taking of the property was a violation of international law. It was the perpetration of genocide. Do you have a reaction to that logic? Well, I guess my reaction to that is it goes back to the domestic takings exception, which under international law, where regardless of how egregious some act may be by a country, that where it involves just the country and its nationals, that doesn't rise to the level of international law because typically international law involves dealings among countries. And so the reaction would be that to the extent that you are going to ignore the domestic taking law even in the face of genocide, and I think this is really what the Seventh Circuit was getting at, is to the extent that you're going to do that, that it's only appropriate under international law to first give that country's courts and court system a chance to handle that before another country gets involved. So that's exhaustion. So I guess I'm asking a question that precedes exhaustion. But I think that they're interrelated because to the extent that you're going to use genocide and the taking of property to trump the domestic taking exception, then that's why you would need to apply the exhaustion requirement as a means of comedy to other nations. I mean, I would just give the example that the Seventh Circuit did. Yeah, so I guess my only point is that then I don't hear you taking issue with the proposition that a case in which rights and property are taken in violation of international law would be a case involving genocide because it's not just that the taking of property facilitates genocide, it's that the taking of property is part of the commission of genocide. And then you get to the question of whether there's an exhaustion requirement embedded within either the FSIA or the principles of international law. You're right to raise that issue. I take that point, and the Seventh Circuit ruled on that. But I guess I'm just asking the predicate question that even sets up the question of exhaustion, which is, is this occasion in which rights and property are taken in violation of international law because the commission of genocide, part and parcel of the commission of genocide, is taking rights and property? I'm not sure that it rises to that level yet. I don't know that there's been any other court that's held that. I think that at least the cases that I'm aware of that have looked at genocide have looked more to the killings and the maltreatment as opposed to the taking of property, and this really is ultimately the strict taking of the property issue. All right. Thank you. Thank you, Your Honors. Does Mr. Gaston have any time? All right, why don't you take three minutes and longer if we have questions. Okay. I'd like to start out by coming back to Judge Srinivasan's question about 1605A5. I may have misunderstood that. I thought you were talking about the commercial activity exception, and I realized you were talking about the tort exception. And I do think the tort exception has very different standards because the tort has to take place in the United States. That's not the case with commercial activity where the effect has to be in the United States, and it's not the case with the expropriation exception either. So the FSIA is a finely tuned and finely calibrated statute that looks at various different situations and tries to address the policy considerations underlying each one. But just so that I'm clear, your complaint, you relied on the expropriation exception. Yes, 1605A3, yes. Not the commercial activity exception. Not the commercial activity exception and not the tort exception. Another point I'd like to mention and expand on is that as I understand Hungary's argument, they're always talking about, well, if you read this in connection with that, and if you look at the treaty and what really should have happened, whether it did or not, you have some sort of conflict. But this is no different than the kind of conflict that Amarada has, Prince, and McKesson held do not rise to the level of invoking the treaty exception. It has to be an express conflict, and it has to be with respect to the country's amenability to suit. Now, whether or not after six months the property was transferred or not, it really doesn't matter. It has nothing to do with Hungary's amenability to suit. Our claim is not pursuant to the treaty. What happens if your suit were to go forward and Hungary were at that point to say, well, the property that issue was disposed of in accordance with the treaty and has been given to these relief organizations? What is the court supposed to do at that point? Well, our suit is for compensation, so there's always a possibility of compensation. We don't believe anything like that actually happened. I think there's a little confusion here. I think what my opposing counsel was referring to was what happened supposedly in 1997 with the establishment of the Jewish Restoration Fund. Nobody disputes that nothing happened in 1947. But certainly if there were a particular bracelet that somebody can find and say, look, I'm sorry, that's in the Jewish Restoration Fund, they can still get compensation for that. I think that's a very far-fetched possibility. What about the argument that under 27, as opposing counsel rightly points out, encompasses not just the property but also the rights, which could be the choses in action? So it sets up a right to get recovery and then it transfers that right to the relief organizations. Yeah, but once again, that does not preclude us from suing to recover either the property or compensation for the property. It simply says this is what we think should happen. It didn't happen. Even if it did happen, it doesn't matter to us. Our claim is not under the treaty. Our claim is for our property. The treaty itself had no exclusivity provision. Article 27 doesn't say... Even if everything had been done exactly the way Article 27 suggests, nothing precludes a claimant today from saying, even if he had been compensated, nothing would preclude him from saying, we have a right to bring this suit against Hungary. Perhaps on the merits there would be a set-off or something, but nothing affects the jurisdiction of the court as to his right to... Because it doesn't speak in terms of exclusivity. Or extinguishment. So on extinguishment, if it in fact says that the cause of action is transferred to the relief organizations, then the relief organizations have that cause of action and they're supposed to administer the entitlement to recovery in some fashion, whatever system is developed. Then that cause, it's gone away, hasn't it? Because the cause that's created by 27.1... I don't think you can read the cause of action to be transferred just because it says property and rights and property. A cause of action has to be specifically named. Shows in action or something like that. There's no mention of that in the treaty. What they mean by property or rights and property is simply if you have shares in a corporation, you have rights in that corporation. I'm sure that's all that was meant there. Can I ask you something? I asked you if this treaty is still in effect, and you said yes. But thinking about it, have you argued that the treaty was violated because they didn't do anything within the six months, they didn't do anything in the first year? So whatever may be in effect from that treaty, they violated it. So we don't... Are you arguing that we don't even have to consider it? Your opponent relies on this language that everybody knows was never followed. And he stresses shall and so forth. Nothing ever happened. It was violated. Those duties were violated. Do you argue that? Yes, I think we do, Your Honor. Our argument actually goes beyond that and says it really doesn't matter if it was violated or not violated. The treaty just does not bear on this issue. However, it is an important historical fact that it was violated. So even if the treaty exhorted Hungary and asked Hungary to undertake certain obligations, it never did so. So yes, that's a very big part of our argument. I mean, it seems to me that the treaty exception assumes that it's going to be honored. Otherwise, we go to the FSIA and this treaty was never honored in the time it was supposed to be. And I don't see why we have to consider it. I agree. My co-counsel and I are here before you this morning as the voice of those who are too old or too weak to speak for themselves. It may well be that our voices are inadequate, but we ask the court to remand this case to the district court so that their hope for justice against Hungary can be pursued further. All right. Thank you. Thank you, Your Honor.
judges: Henderson, Srinivasan, Wilkins